BARNEY REEVES v. STATE.

[64 South. 836.]

1. CRIMINAL LAW. *Homicide. Dying declaration. Evidence.*
   A dying declaration of deceased made after the attending physician had told him "that he could not live" is not admissible where there was nothing in the evidence to indicate that the deceased understood from this, or realized for any other reason, that he was then about to die.

2. SAME.
   The only justification for the admission of dying declarations is the presumption that the near approach of death produces a state of mind in which the utterances of the dying person are to be taken as free from all ordinary motives to misstate and when it appears that the declaration is tainted by a spirit of malice toward the defendant and a desire to be avenged for the wrong which he thought had been done him, it should not be admitted.

APPEAL from the circuit court of Lauderdale county. HON. JNO. L. BUCKLEY, Judge.

Barney Reeves was convicted of murder and appeals.

Appellant was convicted of murder for the killing of one John Hughes, and sentenced to imprisonment in the pentitentiary for life. The state's theory of the case is that the killing was murder, and the defendant's theory was that the shooting was accidental. On appeal, among

other errors, the action of the court in admitting as evidence two alleged dying declarations of deceased, one to the physician, Dr. Bounds, who attended him, and the other to a friend named Howse.

Dr. Bounds testified, over the objection of appellant, as follows: "Q. You are Dr. George Bounds? A. Yes, sir. Q. You are a practicing physician? A. Yes, sir. Q. Did you attend John Hughes in his last illness, Doctor? A. Yes, sir. Q. Did he live or die? A. He died. Q. What was the cause of his death? A. Blood poison from gunshot wound. Q. Blood poison from a gunshot wound? A. Yes sir. Q. Where was the gunshot wound? A. On the right limb, just above the knee— just a little bit above the right knee. Q. How soon after the shooting were you called in? A. I was called between three and four o'clock on Sunday morning, and I think the shooting was somewhere about eleven o'clock between eleven and twelve o'clock, I don't know. Q. When you got to him and examined the wound, what condition did you find the wound in relative to some wadding or any foreign substance in it? A. Well, you couldn't see any of the wadding, anything at all; just a hole about the size, little bit larger than a dollar, and bleeding pretty free then, and the limb—feel the bones crushing. Q. Feel the bones crush? A. Yes, sir. Q. Blood poison, as I understand you, Doctor, is due to an infection, is it not? A. Yes, sir. Q. Some sort of blood— A. Yes, sir. Q. What do you call that germ? A. Stephyococis, four or five different kinds. Q. How long did you atttend this man? A. About thirteen days. Q. Did he ever make any statement to you about— Now, in answering these questions, there are only certain conditions upon which these questions are relative. Did he ever make any statement to you relative to the circumstances? A. Yes, sir. Q. At the time he made those statements, state whether or not he knew he was going to live or die. A. Well that was—the evening he

made the statement was—on Thursday evening before he died Friday morning. I saw him about four o'clock in the afternoon, and I told him that he could not live at the time, and I asked him about how it was done. It was the only time he ever made a statement, and he said Barney Reeves ought to be punished for it, for murdering a man like he did him; that he was—that Barney said he was going to shoot him, and got the gun, and was leveling it on him, and he grabbed hold of the barrel, and was pulling it down, and about the time it got level or even with his knees it shot. Q. That is the statement he made to you after you told him he was going to die? A. Yes, sir. Q. And he did die the next morning? A. Yes, sir. Q. Was it right after you told him that that he made this statement to you? A. Yes, sir. Q. He got no better after that, did he? A. No, sir; nor worse. Q. That was on Thursday about four o'clock? A. Yes, sir. Q. And he died Friday morning? A. Yes, sir. Q. And your statement was, I believe, that he said that Barney ought to be punished for murdering a man the way he had him? A. Yes, sir. Q. That Barney had gotten the gun, leveled it on him, he grabbed it and pushed it down, and when he got it level with his knees the gun fired? A. Yes, sir. Q. That is his statement, is it? A. Yes, sir.''

The witness Howse testified as follows: ''Q. Will, were you present at the time that John Hughes died? A. Yes, sir. Q. Did you have a conversation with him prior to the time of his death? A. No, sir; I never did. Q. Did he make any statement to you before his death? A. That was all the statement he made to me after he— Q. That is what I am asking you about now? A. Yes, sir. Q. How long was that before he died that he made this statement to you? A. I never particularly noticed the clock, but from the time— John was in a terrible lot of misery from the time he made the statement till he died, and from the time he made the statement was about

three hours before he deceased? Q. Did he know he was going to die when he made this statement? A. He explained to his wife and mother that he was going to die. Q. He did? A. Yes, sir; and in about three hours he died. Q. What sort of condition was he in at that time? A. Along at the time he was dying and talking, he looked like that the misery would get here somewhere about his heart, and it just looked like every blood vessel in his arm and neck looked like he was going to bust, and part of us having to rub against his neck and against his heart. Q. Suffering greatly, was he? A. Yes, sir. Q. You have stated, I believe, he told his wife and children? A. Yes, sir, he told his wife— Q. What did he tell his wife and children? A. He told his wife to take his chaps back to her brother at Enterprise where he had married her, and tell her brother to take them and do the best he could by them, because he would be bound to die. Q. He would be bound to die? A. Yes, sir; he said a man, he says, 'in the fix I am, I can't live.' Q. You say he did in about three hours after that? A. Yes, sir; after he got through doing the talking. Q. What statement did he make to you, if any, at that time, about how the shooting happened? (Mr. Gilbert: We object. Overruled.) Q. Go ahead and state what statement. A. He told me then—I went to the bed, I was standing there rubbing him, after he had got through talking to his wife, I says, 'John, do you know did Barney shoot you? He says, 'Yes, I know Barney Reeves shot me.' I says 'A lot of times a man makes a mistake.' He says, 'I made no mistake, because at the time I had hold of the barrel of the gun, and I thought when he made the shot I had pulled it between my legs, but I hadn't.' He says he didn't know, at the time Barney had shot him, of any trouble between him and Barney, why he shot him. He says, 'No; I didn't know of any trouble between me and Barney, why he has shot me.' Q. Did he make any further statement about it? A. Yes, sir; he says, Barney

have murdered me, and I hope the people won't let Barney walk about and not do nothing to him after he have murdered me like he have.' (Mr. Gilbert: We move to exclude this witness' testimony, for the reason that it shows that at the time the declaration was made that the deceased was in such a frame of mind as to destroy trustworthiness of the statement; that he was dominated by a sense of hatred and revenge against the defendant, and for other reasons. Which motion was by the court overruled. To which action and ruling of the court the defendant then and there excepted.)''

*V. W. Gilbert,* for appellant.

With reference to the testimony of Dr. Bounds, who testified that deceased made a dying declaration to him, it is submitted that this testimony was clearly incompetent, for the reason that his testimony does not show that the deceased was laboring at that time under a sense of speedy death or of impending dissolution.

The mere fact that Dr. Bounds informed the deceased that he was going to die does not satisfy the rule of law. It must be the mental attitude and condition and the sense or realization of impending dissolution entertained by the declarant at the time the declaration is made. 2 Wigmore, sections 1441, 1442; *Lipscomb* v. *State,* 75 Miss. 559.

Without protracting this brief into an elaborate and minute argument and analysis of the testimony in this case, it is finally submitted to the court, with all earnestness, that the dying declaration of the deceased John Hughes, as testified to by both Dr. Bounds and the negro witness Will Howze (Howell), should have been excluded by the court, for the reason that the declarations as testified to are wholly lacking in the essential elements of trustworthiness which should surround all dying declarations.

Dying declarations are admitted under the law for two reasons, principally because of the necessity in a great

many cases where circumstantial evidence only is adducible, and second, because the very conditions, surroundings and situation of the declarant made his declarations admissible without oath, or being subject to cross-examination.

If it become apparent that the declarant's mental condition is such that it displays passion, hatred or revenge, then his declarations are not admissible, because the element of trustworthiness is lacking. When men come to die their thoughts are not then concerned with worldly affairs; nor concerned with the passions of life, and when they turn to face the hereafter and the great Unknown, falsehood and passions cannot serve them any further, and they are presumed to speak the truth. But if these elements of passion, hatred, etc., do appear from the declarations, then their minds are more centered upon the things of this life than upon the things to come, and every element of trustworthiness vanishes. See 2 Wigmore, section 1443.

Mr. Wigmore there says: The declarant may exhibit such strong feelings of hatred or revenge that the effect of all the above influences appear to be lacking. If he is in such a frame of mind the supposed guaranty of trustworthiness fails and the declaration should not be admitted." See, also, *Lipscomb* v. *State, supra.*

It is submitted that when the declarant in this case declares "Barney have murdered me and I hope the people won's let Barney walk about and not do nothing to him after he have murdered me like he have," demonstrates beyond every reasonable doubt that at the time he made the statement he was dominated and possessed by a spirit of hatred and malice, and in that hour when these passions should no longer exist, calls out for revenge against his slayer. This spirit of hatred and revenge seems to have been so deeply rooted in his mind that the day before he died he is alleged to have made the same declaration to Dr. Bounds that he made to this

negro witness. If a living witness should make such declarations upon the witness stand his testimony would be entirely discredited. How much more so should a dying declaration be discredited and excluded when every element of trustworthiness has been eliminated by the passions this evinced.

*Geo. H. Ethridge,* assistant attorney-general, for the state.

The second assignment, that the court erred in admitting the dying declaration, is also without merit, because it abundantly appears from the record taken as a whole, that the defendant was conscious of being *in extremis.* The attending physician had told him that his case was hopeless; he had been attending him thirteen days and blood poison had set in and had developed to a degree where the condition of the deceased was of great suffering and pain. It appears, shortly after this statement made to Dr. Bounds, that the deceased called his wife to his bedside and told her that he was bound to die and bid her farewell; he gave her instructions what to do with his children and such parting admonitions as show that the deceased had utterly abandoned all hope and his statement was therefore admissible.

It does not seem to me that there could be any reason for doubt, taking all the testimony together, bearing on this man's contention, that he was conscious of the presence of death; that his mind was face to face with the inevitable hour and that speedy dissolution was certain. Besides, there was no objection interposed at the proper time as to the dying declaration made to Dr. Bounds and there was no objection at all made, as shown in the record, to the testimony of Will Howze as to a dying declaration, and the declaration made to Howze was the same, so far as the facts concerning the killing were concerned, as the one made to Dr. Bounds. It is insisted, however, in the argument that the expression used by

the deceased that he hoped the people would not permit the appellant to walk around and nothing be done about murdering him indicated a state of vengeance that was inconsistent with the idea of the consciousness of immediate and impending death. The authorities cited in appellant's brief on this point is not law in the state of Mississippi because, under our law, all that is necessary is the consciousness of death and the abandonment of all hope of recovery, and it does not depend in any degree upon the religious sentiments of the deceased. These questions, under our practice while they may be considered by the court as a circumstance in determining whether or not hope was actually abandoned when passing on the admissibility of the evidence, are not controlling and they go only to the weight of the evidence when it is admitted to the jury.

Section 1919 of the Code makes a person a competent witness without reference to his religious belief or the want of religious belief, and under all the authorities, a dying declaration is admitted or rejected under the same principles of the admissibility governing the competency of a witness if living.

The authorities cited in the appellant's brief show that where a statute of this kind exists that a dying declaration is admissible whether the party expected to be rewarded or punished for his conduct or not. Under the common law, a witness who did not believe in the Supreme Being who rewarded or punished for good or evil conduct, was not a competent witness and therefore, under the law, his dying declaration was not admissible, but the authorities cited by Mr. Wigmore show that under statutes of the kind, the dying declaration is received and the belief or disbelief goes to the credibility alone of the dying declaration. I submit, however, that the expressions used in the declaration do not indicate a state of mind that could be termed hatred or revenge. It certainly is not contemplated by the law that a declarant's

testimony, delivered in the solemn hour of death should not be received except when he was willing to have his slayer go unpunished. The utmost that the expressions indicated was a solicitude on the part of the deceased for the enforcement of the law and was no call for vengeance or the wreaking of wrath on the defendant by any one other than the authorities of the land and the law of the county.

SMITH, C. J., delivered the opinion of the court.

This as an appeal from a conviction of the crime of murder, and two of the assignments of error are the admission of testimony of two alleged separate and distinct dying declarations made by the person appellant is alleged to have killed. One of these declarations was testified to by Dr. Bounds, and will be found on page 61 of the records, and the other by Will Howse, and will be found on pages 65 and 66 of the record, both of which the reporter will set out in full.

The grounds of these objections are, first, that the testimony does not show that they were made under the realization and solemn sense of impending death; and, second, that the declarations themselves show that at the time they were made the declarant was laboring under such strong feeling of hatred and revenge against appellant as to remove all presumption of their trustworthiness. The first of these objections is maintainable only with reference to the declaration made to Dr. Bounds, but the second of them is maintainable with reference to each of the declarations. Consequently neither of them should have been admitted in evidence.

It is true that Dr. Bounds told the deceased "that he could not live," but there is nothing in the evidence to indicate that the deceased understood from this, or realized for any other reason, that he was then about to die; that he did realize this when he made the second declaration, several hours thereafter, is clear. Both of

the declarations indicate that the declarant in making them was actuated by a spirit of malice toward the defendant and a desire to be avenged for the wrong which he thought had been done him. The only justification for the admission of dying declarations is the presumption that the near "approach of death produces a state of mind in which the utterances of the dying person are to be taken as free from all ordinary motives to misstate." Among such motives and probably the most powerful thereof are malice and the desire for revenge, and when it appears that the declaration is tainted therewith all guaranty of its trustworthiness is removed, and it should not be admitted. 2 Wig. on Ev., sec. 1443; 1 Whar. Crim. Ev., 541. This is true, irrespective of the declarant's belief or not in a punishment in a future state.

Since the admission of dying declarations constitutes an exception to the rule excluding hearsay testimony, and since the influence exerted by them on juries is probably greater than they merit, courts have always admitted them with great care and caution, and never when the supposed guaranties of their trustworthiness have been overthrown. It is true that the state of the declarant's mind at the time the declaration was made should be taken into consideration by the jury in determining the weight to be given it when admitted. Nevertheless, when this state of mind is such that the guaranty of the trustworthiness of the declaration is removed, it should not be submitted to the jury for consideration at all.

*Reversed and remanded.*